**UNITED STATES of America, Plaintiff,**

v.

**1300 LAFAYETTE EAST, a co-partnership, Defendant.**

Civ. A. No. 5–71410.

United States District Court,
E. D. Michigan, S. D.

Aug. 4, 1978.

James K. Robinson, U. S. Atty. by Samuel J. Behringer, Jr., Asst. U. S. Atty., Detroit, Mich., for plaintiff.

Robert V. Seymour, Southfield, Mich., for defendant.

## OPINION

FEIKENS, District Judge.

The United States as assignee of certain mortgages and mortgage notes seeks foreclosure of the mortgages and sale of the encumbered property. 1300 Lafayette, East, a co-partnership which owns the mortgaged property, asserts in defense that there was no default and that plaintiff is barred from foreclosure because it has unclean hands. Defendant also counterclaims for damages caused by claimed wrongful assignment and acceleration of its debt and for breach of a duty to deal fairly.

The prayer for foreclosure and sale is granted, and the counterclaim is dismissed. This opinion constitutes findings of fact and conclusions of law required by Rule 52.

## I. FACTS

Defendant 1300 Lafayette East executed its mortgage note in favor of James T. Barnes and Company on July 12, 1962 in the amount of $8,368,600.00. On the same day defendant executed a mortgage on the fee to be known as 1300 Lafayette East, a luxury apartment building in downtown Detroit, to the James T. Barnes Company to secure repayment of the note. Defendant also executed a "Regulatory Agreement" with the Department of Housing and Urban Development, which was incorporated in and made part of the mortgages. On September 20, 1962, the James T. Barnes Company assigned the mortgage note and mortgage to the Board of Trustees of the City of Detroit Retirement System. Defendant executed a "Modification Agreement" in favor of the Retirement System on January 1, 1965. On May 19, 1967, defendant executed a mortgage note in the amount of $385,000.00 and a mortgage to secure its repayment in favor of the Board of Trustees of the City of Detroit Retirement System. A "Consolidation and Modification Agreement" which consolidated and merged the two mortgage notes and two mortgages referred to above into one debt and obligation was also executed.

Each of the documents referred to above required the making of monthly installment payments. Late charges were authorized if a payment was not made within 15 days of its due date, and each mortgage instrument contained the following provision dealing with default and acceleration:

That should any default be made in the payment of principal or interest of any sum payable under subparagraph (a) or (b) above, which is not made good before the due date of the next such payment, or should default be made in the performance of any other covenant of this mortgage or the note secured hereby or any part thereof, when the same is payable or the time of performance has arrived, as above provided, then all the remainder of the aforesaid sum with all sums due hereunder shall at the option of the Mortgagee without notice become immediately payable thereafter, although the period above limited for the payment thereof may not have expired, anything hereinbefore or in said note contained to the contrary notwithstanding, and any failure to exercise said option shall not constitute a waiver of the right to exercise the same at any other time.

A crucial fact is that a monthly installment payment of principal and interest in the amount of $67,195.31 was due from defendant on September 1, 1970. A check for $67,195.31, dated September 25, 1970, was received by the James T. Barnes Com-

pany as servicing agent for the Board of Trustees of the City of Detroit Retirement System on September 29, 1970. This check was returned by the bank due to insufficient funds and not paid until October 21, 1970. No further monthly payments were tendered by defendant until March of 1971. It is clear that the luxury apartment complex could not pay its own way at that time.

On October 21, 1970, the mortgagee Retirement System executed a "Notice of Default Status on Multi-Family Housing Projects" document, and on November 20, 1970, it completed its election to assign all hypothecations evidencing the above-described loan transaction to the Secretary of Housing and Urban Development under HUD's loan guarantee program. HUD thereupon paid the mortgage note in full to the City of Detroit Retirement System and became the assignee of the consolidated note and mortgage.

Defendant, facing certain foreclosure, entered into negotiations with HUD which culminated in certain provisional work-out arrangements. Their intent was to permit the defendant some time and room to work out its financial difficulties. These provisional work-out arrangements were negotiated for periods beginning March 2, 1971, December 16, 1971, October 11, 1972, and June 14, 1973. Each work-out arrangement begins with the following statement:

> The undersigned mortgagor requests the Assistant Secretary for Housing Management to hold the subject mortgage in default under the terms and conditions stated herein to afford an additional opportunity to effect reinstatement.

Discussions between the parties seeking a complete solution of defendant's problems in 1973 resulted in an independent appraisal of the subject property and the submission by defendant of a "cash final settlement" offer. The offer was for a settlement in full of the debt at a substantially reduced amount. Following an appraisal of the property by the HUD Detroit Office defendant's offer was rejected.

During 1974 the parties nonetheless attempted to negotiate a fifth work-out arrangement, but defendant refused to execute the arrangement finally proposed by HUD. So on July 28, 1975, plaintiff began this suit seeking possession of the property, an accounting, foreclosure of the mortgages, and sale of 1300 Lafayette East.

## II. THE CONTENTIONS OF THE PARTIES

Plaintiff as assignee contends that it is entitled to a judgment of foreclosure and sale because of defendant's default of the mortgage notes. It asserts that default is conclusively proved by the following facts:

1. The September 1, 1970 payment was not received until October 21, 1971.
2. No payments were made for October 1970 through February 1971.
3. Each of the work-out arrangements asks the Assistant Secretary to hold the mortgages in default, but to forebear foreclosure if the terms of the arrangement are performed.
4. Defendant has failed to file all reports and statements of account required by the Regulatory Agreement.

Defendant attempts to counter plaintiff's case with the contentions that:

1. Any breach caused by the delay in making the September 1, 1970 payment was cured when the servicing agent of the mortgagee "accepted" the installment and late charges on October 21, 1970.
2. This cure rendered the assignment to HUD improper.
3. The wrongful acceleration of the debt by the mortgagee on October 21, 1970 was a breach of the contracts between the parties that suspended the obligation to make monthly payments.
4. The work-out arrangements should be considered as without prejudice to defendant and construed to ask the Assistant Secretary to merely "treat the mortgage *as if* it were in default."
5. The continuous series of work-out arrangements modified and superseded the original mortgages and mortgage notes.

6. Plaintiff has all required reports and statements of account in its possession.

7. Plaintiff's failure to consider defendant's "Cash Final Settlement" offer evidences bad faith which renders its hands unclean and bars this foreclosure action.

In its counterclaim defendant seeks damages for wrongful assignment and acceleration and for breach of a duty to deal fairly. Plaintiff responds by asserting that there was a default that justified the acceleration; defendant has no standing to attack the assignment by the mortgagee to HUD; plaintiff was patient and cooperative in its dealings with defendant during nearly five years of default; and, in any event, defendant has suffered no damages.

## III.  DEFAULT

Defendant was clearly in default on October 1, 1970 when its October payment was due and its September payment remained unpaid. The check for the September payment was not honored until the fourth presentation, and the payment was not received by the mortgagee until October 22, 1970. On October 21, 1970, prior to receiving the September payment, the mortgagee executed the notice of default status accelerating the entire mortgage debt. The mortgagee also initiated procedures for assignment of the mortgages and notes to HUD. When it received the September payment on October 22, 1970, the mortgagee applied the amount received to satisfy unpaid late charges and other accounts, and continued to implement the assignment to HUD. This did not effect a cure of the default, and the accounting treatment of these transactions by the Loan Insurance Division of HUD did not constitute a waiver.

■ But even assuming that there was no default in October, this mortgage debt has been in arrears and unpaid for nearly eight years. The failure to make payments for the months of October, November, and December of 1970 and for January and February of 1971 proves an abandonment of this obligation by defendant, and the income from the property during these periods has not been satisfactorily accounted for by defendant. These defaults clearly justify acceleration and foreclosure.

In each of the work-out arrangements, defendant admitted that the debt was in default. It made payments that were far smaller than those called for by the mortgages and mortgage notes. The payments were not even sufficient to cover the 5¼ per cent interest due on the debt, and consequently defendant continued to fall further and further behind in its obligations.

The work-out arrangements in no way modified or superseded the original mortgages and mortgage notes. They were "provisional" and explicitly stated that the Assistant Secretary would "hold the subject mortgage in default" and forbear for a specified period of time only. A representative clause in the October 11, 1972 work-out arrangement states:

> It is further understood that these Arrangements are strictly on a month-to-month basis and the Assistant Secretary for Housing Management will take no action prior to June 30, 1973, because of the existing monetary default provided the minimum payments recited above are made and the performance of the mortgagor is otherwise satisfactory.

The long-standing series of defaults described above entitles plaintiff to the judgment of foreclosure and sale it seeks.

## IV.  COUNTERCLAIM

Since there undoubtedly is a default, acceleration of the debt by the mortgagee and/or HUD was proper, and defendant cannot use such acceleration as the basis for a claim against plaintiff. The assignment of the mortgages and notes to HUD was also proper.

■ Additionally, defendant has no standing to attack the assignment. None of the hypothecations given by defendant to evidence this loan transaction contain any covenant that prevents the mortgagee from

assigning the same to a third party. The loan documents repeatedly contemplate a possible assignment of the hypothecations to HUD. An assignment by the mortgagee to any third party would not alter any of the obligations of the mortgagor under the mortgages and notes. The claimed impropriety of the acceleration would not be affected by an assignment nor would any of defendant's rights be compromised by an assignment by the insured mortgagee to its insurer, HUD.

Defendant's reliance on paragraph 10 of the Regulatory Agreement is misplaced. The portion relied upon states:

10.  Upon a violation of any of the above provisions of this Agreement by Owners, the Commissioner *may* give written notice, thereof, to Owners, by registered or certified mail, addressed to the addresses stated in this Agreement, or such other addresses as may subsequently, upon appropriate written notice thereof to the Commissioner, be designated by the Owners as their legal business address. If such violation is not corrected to the satisfaction of the Commissioner within 15 days after the date such notice is mailed or within such further time as the Commissioner determines is necessary to correct the violation, without further notice the Commissioner *may* declare a default under this Agreement effective on the date of such declaration of default and upon such default the Commissioner *may*:

(a)(i) If the Commissioner holds the note—declare the whole of said indebtedness immediately due and payable and then proceed with the foreclosure of the mortgage;

(ii) If said note is not held by the Commissioner—notify the holder of the note of such default and request holder to declare a default under the note and mortgage, and the holder after receiving such notice and request, but not otherwise, at its option, may declare the whole indebtedness due, and thereupon proceed with foreclosure of the mortgage, or assign the note and mortgage to the Commissioner as provided in the Regulations;   .   .   .   (emphasis supplied)

This provision grants the Commissioner discretion to elect from among several courses of action following a default. The language, "but not otherwise" in sub-subparagraph (a)(ii), is clearly for the protection of the Commissioner. Defendant's own evidence demonstrates conclusively that the Commissioner was the party in need of such protection in the face of rising interest rates. Defendant's evidence also established that the Commissioner rarely, if ever, used the procedure outlined in sub-subparagraph (a)(ii). Furthermore, the assignment resulted in no injury of any kind to defendant.

Far from establishing a breach of any duty to deal fairly on the part of plaintiff, defendant's proofs showed plaintiff's long-suffering cooperation. In spite of defendant's failure to make payments for five months, HUD negotiated four work-out arrangements that permitted defendant to make payments that were less than the interest due for over 40 months. HUD was even willing to negotiate on the terms of a fifth work-out arrangement. Julian McKay, Director of the Office of Loan Management during the period from 1972 through 1975, and defendant's principal witness, gave defendant as much assistance as he possibly could.

HUD was under no obligation to accept or even consider defendant's Cash Final Settlement offer. Discussion of the possibility of such a resolution did not impose new duties upon plaintiff. Defendant has shown no damages in any event; it still owes a debt which it voluntarily assumed at the onset of the project in 1962.

Defendant has a fundamental misconception as to the nature of these transactions. It was not forced to enter into the project, nor was it forced to enter into this type of financing arrangement. Its managing partner, Morton Scholnick, is a highly edu-

cated, sophisticated businessman with long experience in real estate and construction in the Detroit area. The partnership assessed the risks involved and voluntarily assumed the obligations evidenced in the mortgages, notes, and regulatory agreement. HUD was *not* a partner in this project, and it assumed *none* of the risks of ownership. When defendant ascertained the conditions upon which HUD would insure the mortgage on the proposed project it had a choice either to proceed, to abandon the project, or seek other financing arrangements. Once it elected to assume the obligation and the attendant risks, it was bound to carry them out. It cannot now urge that HUD was under an obligation to pursue a settlement that would have given defendant the property free of any encumbrance for payment of less than half of the outstanding mortgage principal. The imposition of such a duty by this court would certainly deprive HUD, as a guarantor of the debt, of a good deal of needed protection.

The fatal flaw in defendant's case is demonstrated by its inability to prove any damages. Even assuming, *arguendo*, that plaintiff's actions were wrongful, defendant still only owes a debt which it voluntarily incurred. In fact it has experienced a substantial reduction in its payment schedule while interest has accrued at only 5¼ per cent—far below the prime lending rate at any time since the first default. Even if the plaintiff's prayer for foreclosure and sale were denied, the full amount of the mortgage debt plus accrued interest would still be owed by defendant. The parties agree that a default would occur immediately if the original payment schedule were again imposed.

The counterclaim is dismissed.

### V. ISSUES UNDER THE REGULATORY AGREEMENT NOT RAISED IN THIS CASE

This is a proceeding in equity for foreclosure and sale under the terms of the mortgages and mortgage notes. While the Regulatory Agreement was incorporated by reference into these documents, the matter of a monetary default is the only issue asserted by plaintiff against defendant partnership in this case. Any other potential claims plaintiff may have against the partnership or against the individual partners are not pleaded nor were any proofs offered. When plaintiff conducts a complete audit, it may or may not wish to proceed against the partnership or any of the individual partners for other possible violations of the Regulatory Agreement. Nothing in this opinion in any way bars, estops, or is *res judicata* as to any such potential claims.