**UNITED STATES of America**

v.

**Jack W. BLUMENFELD and Alan Feingold.**

**Civ. A. No. 89–6999.**

United States District Court, E.D. Pennsylvania.

April 25, 1991.

Michael Baylson, U.S. Atty., James G. Sheehan, Asst. U.S. Atty., David F. McComb, Philadelphia, Pa., for plaintiff.

Gilbert B. Abramson, Abramson, Cogan, Kogan, Freedman & Thall, P.C., Thomas S. McNara, Michael B. Tolcott, Philadelphia, Pa., for defendants.

## MEMORANDUM

LUDWIG, District Judge.

Plaintiff United States of America and defendants Jack W. Blumenfeld and Alan Feingold cross move for summary judgment.[1] Fed.R.Civ.P. 56(c).

In this action, the United States of America sues to enforce the interests of the Department of Housing and Urban Development. In 1982, HUD and Executive House Associates, a limited partnership, entered into a regulatory agreement as part of the latter's financing of an apartment house project in Philadelphia.[2] According to the complaint, "defendants made, or received and retained, distributions of income of the project in excess of $2.4 million, in violation of the [regulatory] Agreement" and the federal priority statute. Gov't exh. B; 31 U.S.C. § 3713 (1982). Complaint ¶¶ 15, 48. Jurisdiction is federal question. 28 U.S.C. §§ 1331, 1345.

Defendants assert that this action is barred by res judicata or, as a secondary alternative, by waiver and estoppel. In 1988, EHA filed a chapter 11 bankruptcy petition. On January 17, 1990 the bankruptcy court confirmed the fifth amended reorganization plan. Defendants contend that the confirmation order precludes the government's claims under either the regulatory agreement or the federal priority statute. If res judicata preclusion does not apply to enforcement of the regulatory agreement, there are alleged to be triable issues based on waiver and estoppel.

## I.

The following are agreed facts:[3]

"1. Executive House Associates ('EHA') is a Pennsylvania limited partnership which was formed to develop and operate an apartment building known as Executive House, which is located at 6100 City Avenue, Philadelphia, Pennsylvania ('Executive House' or the 'Project'). At all times relevant to this action the general partners of EHA were Jack W. Blumenfeld and Alan Feingold.

"2. On August 3, 1982, EHA borrowed $18,634,500 from VNB Mortgage Corp., a private mortgage lender, as part of the financing for the development of the Project. To evidence and secure its obligation to repay the loan, EHA executed both a mortgage note ('Note') and mortgage ('Mortgage'), true and authentic copies of which are Exhibits 1 and 2, respectively, to Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment ('Defendants' Memorandum'). The Note expressly incorporates the terms of the Mortgage.

"3. At the loan closing on August 3, 1982 (the initial closing), the Secretary of Housing and Urban Development ('HUD') endorsed EHA's Note for insurance under Section 221(d)(4) of the National Housing Act, thereby insuring the advances to be made on the construction loan to develop the Project.

"4. At the initial closing, EHA's Note and Mortgage were assigned to the Pennsylvania Housing Finance Agency ('PHFA')

---

1. Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. The movant must show that there is no triable issue. The nonmovant having the burden of proof at trial must point to affirmative evidence in the record—and not simply rely on allegations or denials in the pleadings—in order to defeat a properly supported motion. *Celotex Corp. v. Cartrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Williams v.* *Borough of West Chester,* 891 F.2d 458, 460, 463–64 (3d Cir.1989).

2. Defendants Jack W. Blumenfeld and Alan Feingold were general partners of EHA when it entered into the regulatory agreement. Feingold ceased to be a general partner on December 31, 1988. Def. exh. 27 at 5.

3. These facts were agreed to in a joint pre-trial stipulation filed February 27, 1991.

pursuant to a Collateral Agreement entered into on the same date.

"5. The Government National Mortgage Association ('GNMA') issued commitment # 925980 that upon the completion of the construction of the project and the final endorsement of the Mortgage Note by HUD, it would purchase EHA's Note and Mortgage.

"6. HUD finally endorsed EHA's Note on January 9, 1985 (the final closing) and GNMA purchased EHA's Note and Mortgage from Sovran Mortgage Corporation, then holder of EHA's Note and Mortgage by assignment from PHFA, on January 10, 1985.

"7. In consideration of HUD's endorsement of EHA's Note for insurance, Jack W. Blumenfeld, acting in his capacity as general partner, signed a Regulatory Agreement with HUD on August 3, 1982. A true and authentic copy of the Regulatory Agreement is Exhibit 3 to Defendants' Memorandum ('Defendants' Exhibit 3'). Alan Feingold did not sign the Regulatory Agreement.

"8. Section 11 of the Mortgage expressly incorporates the provisions of the Regulatory Agreement into the Mortgage and makes the Regulatory Agreement part of the Mortgage.

"9. The Regulatory Agreement was in effect at all times pertinent to this action.

"10. Under the terms of the Note and Mortgage, commencing on May 1, 1985, EHA was obligated to pay $166,350.55 on the first day of each month for 60 consecutive months. Thereafter, monthly installments of principal and interest in the amount of $146,975.39 were due and payable to the mortgagee on the first day of each subsequent month until the entire indebtedness was paid.

"11. Failure to pay any installment of principal and interest within thirty (30) days after the due date is a default under the Mortgage; in such event, at the option of the mortgagee, the principal of the debt is due and payable. Under the Note, such failure is an automatic default.

"12. The Mortgage payment that was due on September 1, 1985 was not paid before the due date of the next installment.

"13. GNMA, holder of EHA's Note and Mortgage by purchase, mailed a Notice Of Default Status to EHA dated October 15, 1985.

"14. ERA made sporadic payments of approximately $600,000 on its Mortgage debt during 1985 and 1986; however, it made no payments on this debt in either 1987 or 1988.

"15. On January 16, 1987, GNMA assigned EHA's defaulted Note and Mortgage to the Secretary. The Secretary paid GNMA's claim on the defaulted Mortgage. As a result, on the date EHA filed its voluntary petition in bankruptcy, January 22, 1988, the Secretary's adjusted secured claim against EHA was $22,564,947.64.

"16. The bankruptcy court valued the project at $12,900,000, and crammed down the value of the Secretary's secured claim to $13,800,000, which represents the value of the Project plus $900,000 in Project rents.

"17. During the period commencing October 1, 1985 through January 1988, Jack W. Blumenfeld, through EHA, made advances to the Project totalling $720,100 for operating expenses other than payroll, and made loans to the Project in the amount of $1,034,961 for Project payrolls.

"18. During this same time period, EHMC paid the sum total of $2,542,900 to Jack W. Blumenfeld through EHA. This amount represents repayments of advances that Blumenfeld made to the Project.

"19. Under the terms of the Regulatory Agreement, within sixty (60) days following the end of each fiscal year, the Owners of the Project were required to furnish HUD with a complete annual financial report based upon an examination of the books and records of EHA prepared in accordance with HUD's requirements, certified to by an officer or responsible owner, and when required by HUD, prepared and certified by a Certified Public Accountant, or other person acceptable to HUD.

"20. Under the terms of the Regulatory Agreement, at HUD's request, Owners furnish monthly occupancy reports (sometimes referred to as 'Monthly Accounting Reports') and give specific answers to questions upon which information is desired relative to the income, assets, liabilities, contracts, operation, and condition of the property and status of the insured Mortgage.

"21. HUD requires monthly occupancy reports from Owners of insured projects that are experiencing financial or operating difficulties, and from Owners of insured projects that have not achieved full occupancy.

"22. HUD employs personnel known as loan servicers within the Loan Management Branch of its field offices. Loan servicers are the first line employees within the branch who monitor the operation, management, and financial condition of multifamily projects that are financed with HUD insured loans. The duties of such persons include review and analysis of the annual financial statements and monthly occupancy reports, and communication with project ownership regarding any questions, problems or concerns arising from such reviews. At any given time, only one servicer is assigned to a project.

"23. The Project became available for occupancy in April 1984.

"24. EHA was required to submit monthly occupancy reports to HUD starting April 1984. Therefore, no monthly reports were submitted before April 1984.

"25. a. Monthly Accounting Reports for *April 1984 through October 1984* are all marked as having been prepared on January 21, 1985; the Monthly Accounting Report for *November 1985* is dated January 8, 1985; that for *December 1984* is dated February 20, 1985. Samples of complete Monthly Accounting Reports are attached hereto as Government Exhibit 1 (December 1984 & January 1985). These reports appear on unaltered HUD forms. Such reports were not received until after January 1985.

"b. HUD acknowledged receipt of the Monthly Accounting Reports for April 1984—December 1985 and requested further information and clarification by letter dated June 18, 1985. Government Exhibit 2. Letter from Joseph N. Russell, Jr., Chief, Loan Management Branch, HUD, to Jack Blumenfeld. This letter and the other letters from Russell noted in this stipulation were prepared for Russell's signature by the loan servicers, Betty Johnson and her successor, Thomas Walsh, assigned to the Project. In the letter of June 18, 1985, Blumenfeld was asked, 'Please explain and/or correct disbursements reflected as "Return to Owner."'

"c. The reply letter of July 25, 1985 from John McAleer, Financial Controller, EHA, responded, 'As discussed, the Return to Owner designation was to transfer funds from one account to the other for the project. We will consolidate these accounts into one Executive House Agency Account and our reports for 1985 will conform.' Government Exhibit 3.

"26. Monthly Accounting Reports for *January 1985 through July 1985* are all marked as having been prepared on August 15, 1985. These were forwarded to HUD by letter dated August 22, 1985. Defendants' Exhibit 15. Beginning with these reports, the reports at Schedule 'B' ('Schedule of Disbursements') omit the name of the payee and dollar amounts of checks identified by date and check number and designated as 'Return to Owner.' *E.g.* Government Exhibit 1, January 1985. Instead, total monthly figures and total cumulative figures of 'Return[s] to Owner' appear at the end of Schedule 'C' ('Schedule of Accounts Payable') under the designation ('Schedule of Accounts Payable: Owner'). *Id.* Also beginning with these reports, item #8 of the cover/summary sheet of the Monthly Accounting Reports, entitled 'Accounts Payable' and broken into '(a) Routine' and '(b) Flexible Subsidy/MIO Plan Items,' was altered to break down into '(a) Routine,' '(b) Owner,' and '(c) Advance/Rents.' *Id.*

"27. The Monthly Accounting Report for *August 1985* is marked as having been prepared on September 24, 1985.

"28.  a.  Monthly Accounting Reports for *January 1986 through June 1986* were forwarded to HUD by letter July 24, 1986. Government Exhibit 4.  These reports and all following reports, except as noted, do not reflect the date of preparation.

"b.  HUD acknowledged receipt of these monthly reports and requested further information and clarification by letter dated August 26, 1986.  Defendants' Exhibit 23 (Letter from Russell to Martin Rabinowitz, Treasurer, EHA).  The letter specifically requests additional information on checks designated on Schedule B with 'Return to Owner' in the Payee Column, nothing in the purpose column, and nothing in the amount column ('Omitted Payee and (or) Amount').

"c.  EHA's reply letter of September 16, 1986 responded: 'Omitted Payee and (or) Amount—these checks were transfers from the managing agents account to the owners account.  The reason the amount was not included is they are not considered operating disbursements.'  Defendants' Exhibit 24 (Letter from Rabinowitz to Russell).

"d.  The HUD letter of August 26, 1986 also requested, '[P]lease explain the following variance.  We were unable to reconcile it from the data submitted.  Returns to owner  1/1/86—6/30/86 = $664,950.00.  Advanced from owner 1/1/86—6/30/86 $332.631.84.  Excess of Returns over advances received from owner. $332,318.16.'  Defendants' Exhibit 23.

"e.  EHA's reply letter of September 16, 1986 responded:

'Variance—please understand that the returns to owner as shown in our report simply represent [transfers] of cash from the managing agent to the owner.  Advances from owner represent cash advances from the owner to the managing agent or disbursements made directly by the owner.  Please be advised that the payroll expense is incurred by the general partner.  This amount is not shown as a cash disbursement but is brought into the report through the reconciliation of the accounts payable to the general part-

ner.  While you indicate that there was an excess of returns over advances of some $332,000 please be advised that in July as you will notice on this report, the amount was reduced by over $164,000.  In addition, during the first seven months of the year, the general partner contributed total payroll of $207,952.29.'  Defendants' Exhibit 24.

"29.  The Monthly Accounting Report for *July 1986* was forwarded to HUD by letter dated September 16, 1986.  Defendants' Exhibit 24.

"30.  a.  The Monthly Accounting Reports for *August 1986 through February 1987* were submitted sometime between December 1986 and May 26, 1986.  Government Exhibits 5 and 6 (HUD Letters of December 16, 1986 and April 10, 1987 requesting submission of delinquent reports); Government Exhibit 7 (HUD Letter of May 26–27, 1987 acknowledging receipt of reports and requesting further information).

"b.  Receipt of these Monthly Accounting Reports was acknowledged and further information requested by HUD letter dated May 26–27, 1987.  Government Exhibit 7. HUD again requested further information concerning those checks identified by the designation 'Return to Owner' in the Payee column of Schedule B ('Omitted Payee and (or) Amount').  The letter also requested 'a separate list of all funds paid to the owner from the project, and a corresponding column of all advances made to the project from the owner.  This list will enable our office to reconcile the correct status of advances.'  *Id.*  There was no response to this letter.

"31.  The Monthly Accounting Report for *March 1987* was forwarded to HUD by letter dated May 14, 1987.  Government Exhibit 8.

"32.  The Monthly Accounting Reports for *April 1987 through October 1987* were forwarded to HUD by letter dated November 30, 1987.  Defendants' Exhibit 26.

"33.  The Monthly Accounting Reports for *November 1987 through January 1988* were submitted after the date of filing for bankruptcy by EHA, which was the same

date the Project was to go to judicial foreclosure.

"34. As of June 1985, the HUD loan servicer assigned to the Executive House project was BJ Faulkner, [not] Betty Johnson. She was subsequently succeeded by Thomas Walsh.

"35. EHA was one of several real estate projects developed and operated by Jack Blumenfeld and Alan Feingold, through various corporations and partnerships that they owned.

"36. From the inception of the Project, EHA utilized a corporate managing agent, Executive House Management Corporation ('EHMC'), to receive the rental revenues and pay certain operating expenses of the Project, rather than EHA receiving such rent revenues and paying such Project operating expenses directly.

"37. In addition, EHA utilized the services of The Blumenfeld Corporation, a corporate paymaster also used by other entities owned by Jack Blumenfeld, to process the payroll and employee benefits for Project personnel.

"38. From January 1985 through December 1987, The Blumenfeld Corporation not only processed the monthly payroll for Project personnel, but also advanced the monies for such payroll from funds supplied to it by Jack W. Blumenfeld and Company ('JWB & Co.'), a sole proprietorship owned and conducted by defendant, Jack Blumenfeld.

"39. JWB & Co. also advanced additional funds to EHA throughout the period from January 1985 through October 1987.

"40. During the period from January 1985 through December 1987, EHA made disbursements to JWB & Co. A schedule summarizing the advances and disbursements as listed on the Monthly Accounting Reports is attached as Defendants' Exhibit 35.

"41. Both Schedule A and the Schedule of Accounts Payable of the Monthly Accounting Reports that EHA submitted to HUD bear the notation 'advances from' and 'returns to owner.'

"42. EHA filed a voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Pennsylvania on January 22, 1988.

"43. On May 16, 1988, HUD filed a Proof of Claim in the EHA Chapter 11 proceedings indicating that the United States of America, by the Federal Housing Commissioner, acting on behalf of HUD, had a secured claim against EHA in the amount of $23,177,215.57, plus accrued interest and charges. HUD did not assert any claim against EHA for breach of the Regulatory Agreement, or for violation of the Federal Priority Statute. A true and authentic copy of the Proof of Claim, including an Authentication form listing the attachments to the Proof of Claim, but excluding the attachments themselves, is set forth as Defendants' Exhibit 11.

"44. Among the documents attached to the Proof of Claim filed by HUD were the Note, the Mortgage, and the Regulatory Agreement.

"45. On September 28, 1989, while the Chapter 11 case of EHA was still pending, the United States commenced the instant action against defendants Blumenfeld and Feingold, as general partners of EHA.

"46. On January 17, 1990, Judge Fox entered an Order Confirming the Fifth Amended Plan of Reorganization filed by EHA. A true and correct copy of EHA's Fifth Amended Plan of Reorganization is set forth as Defendants' Exhibit 12.

"47. The Plan classifies the secured claim of HUD as a Class 3 claim. As indicated in Section 3.3 of the Plan, HUD elected to have its entire claim treated as a secured claim, pursuant to Section 1111(b)(2) of the United States Bankruptcy Code. Under the Plan, EHA is required to pay HUD $128,105 per month until HUD receives cash payments in at least the aggregate amount of its Allowed Elected Secured Claim and having a present value of $13,800,000. EHA has paid monthly installments of $128,105 to HUD as required by the Plan, each month since April 1990.

"48. Section 3.3 of the Plan also provides that '[t]he Class 3 Creditor [HUD] shall have no recourse to the General Partners [Jack Blumenfeld and Alan Feingold] or to other assets of Debtor on which its retained liens do not attach.'"

Stip. ¶¶ 1–47.[4]

## II.

■ Defendants' first line of defense is the doctrine of res judicata. Def. mem. 18–25. It is correct that HUD participated in the chapter 11 bankruptcy by filing a proof of claim for $23,177,215.57 representing the limited partnership's accelerated mortgage debt. *See* stip. ¶ 43. Also, HUD did not assert in those proceedings any claims for violations of the regulatory agreement or the federal priority statute. *Id.* Eventually, the bankruptcy court confirmed EHA's reorganization plan. *See* stip. ¶ 46.

The doctrine of res judicata is intended to be a bar to repetitious litigation. *See Cramer v. General Telephone and Electronics Corporation*, 582 F.2d 259, 266 (3d Cir.1978), *cert. denied*, 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 90 (1979).

> Application of the claim preclusive aspect of the res judicata doctrine requires a showing by [defendant] that there has been (1) a final judgment on the merits in a prior suit involving (2) the same parties or their privies and (3) a subsequent suit based on the same causes of action.

*United States v. Athlone Industries, Inc.*, 746 F.2d 977, 983 (3d Cir.1984). *See generally Gregory v. Chehi*, 843 F.2d 111, 116 (3d Cir.1988).

A bankruptcy court order will preclude a subsequent suit on all issues that were or could have been litigated in the bankruptcy. *See Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir.1988); *Sprague, Thall & Albert v. Ar-*

ens, 1986 WL 2456 at 2 (E.D.Pa. Feb. 20, 1986).

In this case, the applicability of res judicata requires two determinations: First, whether the parties in this suit are identical to or in privity with the parties in the bankruptcy; and second, whether the causes of action are the same as those that were or could have been litigated in the bankruptcy. *See Sports Factory, Inc. v. Chanoff*, 586 F.Supp. 342 (E.D.Pa.1984).

As to parties, defendants urge that general partners stand in privity with their partnership.[5] However, under both the regulatory agreement and the federal priority statute, the government's claims are against defendants in their individual capacities as "owners" and "representative[s] of a person." Gov't exh. B at ¶ 17; 31 U.S.C. § 3713(b) (1982). HUD's bankruptcy claim was against EHA, the limited partnership, not Jack Blumenfeld and Alan Feingold in their individual capacities. Unlike the claims against the general partner in *Sports Factory*, the claims here arise from defendants' alleged actions as agents of EHA and not exclusively from their status as general partners. For this reason, the claims in this action are not barred by the bankruptcy court's order confirming EHA's plan of reorganization. *See United States v. 1300 Lafayette East*, 455 F.Supp. 988, 993 (E.D.Mich.1978) (a foreclosure and sale proceeding by HUD against a partnership did not preclude "any other potential claims plaintiff may have against the partnership or against the individual partners" including claims of violations of the regulatory agreement). *See also Sports Factory*, 586 F.Supp. at 348 (limited partnership's agent not so closely connected with partnership that suit against partnership would be tantamount to suit against agent).

In addition, the present causes of action under the regulatory agreement and the

---

4. The paragraph mis-numbering in the stipulation was corrected.

5. *See Sports Factory, Inc. v. Chanoff*, 586 F.Supp. at 347–48 (a federal action alleging RICO and security law violations against a general partner is barred through res judicata by prior arbitration award against the partnership for fraud and intentional breach of contract).

In *Sports Factory*, plaintiff sued defendant in his capacity as general partner of a limited partnership. Any liability under RICO or the federal security laws would be premised on Pennsylvania law, which provides that a general partner is personally responsible for the actions of a limited partnership. *Id.* at 348. 59 Pa.C.S.A. § 523 (Purdon Supp.1990).

federal priority statute differ from HUD's bankruptcy claim. *See United States v. Athlone Industries, Inc.*, 746 F.2d at 983 (res judicata does not apply when different causes of action are asserted). The bankruptcy court determined the validity of HUD's mortgage under Pennsylvania law; the value of its secured claim; and whether it had a perfected security interest in the rental income of the project. *See* gov't reply mem. at 6; stip. ¶ 43. The government's present claim arises from EHA's repayments to Blumenfeld of advances made by him during the years 1985 to 1987.[6] *See, e.g., United States v. Ringley*, 750 F.Supp. 750, 757 (W.D.Va.1990) (statute permits government to "split its cause of action" to collect reclamation fees against "operator" as both a "person" and a "partnership"). *See also 1300 Lafayette East*, 455 F.Supp. at 993 (claims under regulatory agreement not precluded by action under mortgage and note even though "the regulatory agreement was incorporated by reference into these documents").

Res judicata, therefore, is not applicable. As between the bankruptcy proceeding and this action, neither the capacities of the parties nor the causes of action coincide.

### III.

■ Defendants are alleged to have "made, or received and retained, distributions of income of the project in excess of $2.4 million in violation of [paragraph 6(e) of the regulatory] Agreement." Complaint ¶ 15. This paragraph of the agreement prohibits "distributions ... from borrowed funds" prior to the completion of the project or while any default persists under the agreement or under the note or mortgage.

6. Owners shall not without prior written approval of the Secretary:

(b) Assign, transfer, dispose of, or encumber any personal property of the project, including rents, or pay out any funds except from surplus cash, except for reasonable operating expenses and necessary repairs.

.     .     .     .     .

(e) Make, or receive and retain, any distribution of assets or any income of any kind of the project except surplus cash and except on the following conditions:

(1) All distributions shall be made only as of and after the end of a semi-annual or annual fiscal period, and only as permitted by the law of the applicable jurisdiction;

(2) No distribution shall be made from borrowed funds, prior to the completion of the project or when there is any default under this Agreement or under the note or mortgage;

(3) Any distribution of any funds of the project, which the party receiving such funds is not entitled to retain hereunder, shall be held in trust separate and apart from any other funds; and

(4) There shall have been compliance with all outstanding notices of requirements for proper maintenance of the project.

Def. exh. 3.

On October 15, 1985 GNMA declared EHA's mortgage in default. *See* stip. ¶ 13. Between October 1, 1985 and January, 1988, Executive House Management Corporation, defendants' operating entity, paid

---

**6.** The federal priority statute provides for individual liability when representatives of a government debtor cause the debtor to pay other debts before the claim of the United States. 31 U.S.C. § 3713(b) (1982). *See King v. United States*, 379 U.S. 329, 339, 85 S.Ct. 427, 432–33, 13 L.Ed.2d 315 (1964).

Defendants argue "that where the United States elects to prosecute its claim for a debt in a judicial proceeding, rather than simply relying upon its statutory priority, the United States ... [is] barred by principles of *res judicata* from relitigating the same cause of action based upon

violation of the Federal Priority Statute." Def. mem. at 22. Defendants cite cases where the United States sought to recover debts from executors of estates in probate proceedings. *See, e.g., United States v. Vibradamp Corporation*, 257 F.Supp. 931, 937 (S.D.Cal.1966). However, a personal representative with notice of a debt due the government is liable under § 3713(b) "even though the Government had not submitted a claim in the probate proceedings." *United States v. Boots*, 675 F.Supp. 550, 551–52 (E.D.Missouri 1987).

$2,542,900 to Blumenfeld from EHA receipts. *See* stip. ¶ 18. During this period, the mortgage was in default. As noted, the amounts paid to Blumenfeld were for advances previously made by him to the project.

Although the mortgage note is conceded to be nonrecourse, the government predicates defendants' personal liability in part on violations of express provisions of the regulatory agreement. *See* gov't mem. at 6; gov't reply mem. at 13–14. Paragraph 17 states:

The following owners: Executive House Associates, A Pennsylvania Limited Partnership, Jack W. Blumenfeld, General Partner do not assume personal liability for payments due under the note and mortgage ... provided that said Owners shall remain liable under this Agreement only with respect to matters hereinafter stated; namely:

(a) for funds or property of the project coming into their hands which, by the provisions hereof, they are not entitled to retain; and

(b) for their own acts and deeds and acts and deeds of other[s] which they have authorized in violation of the provisions hereof.

Def. exh. 3.

However, the agreement's definition of "distribution," in paragraph 13(g), contains an operating expenses exclusion:

"Distribution" means any withdrawal or taking of cash or any assets of the project, including the segregation of cash or assets for subsequent withdrawal within the limitations of Paragraph 6(e) hereof, and excluding payment for reasonable expenses incident to the operation and maintenance of the project.

Def. exh. 3. A government audit confirmed that $1,034,961 of the payments to Blumenfeld were reimbursements of his advances of project payrolls. *See* stip. ¶ 17; gov't exh. D at 4.

At this juncture, the government refers to a HUD handbook. "Even if defendants were to characterize the distribution to them as repayments of advances to the project," paragraph 8 of *Financial Operations and Accounting Procedures for Insured Multifamily Projects* (April 1974) provides that:

8.C. If the project is delinquent under the mortgage, loans and advances made by the owner to meet necessary and reasonable operating expenses may not be repaid from project income unless written approval has been given by HUD.

Gov't mem. at 16; gov't exh. C. Given this handbook clarification, paragraph 6(e), as modified by 13(g), is alleged to include all owner reimbursements as "distributions"— including those for operating expenses.

Defendants respond that the handbook at paragraph 8.A also excepts operating expenses from owner distributions in much the same way as the regulatory agreement's paragraph 13(g)—and, furthermore, the handbook is not incorporated into the regulatory agreement. *See* def. exh. 40 at 21; def. mem. at 30–31.[7]

The management agreement with HUD, signed for EHA by defendant Alan Feingold, refers to and utilizes the handbook's financial reporting requirements. *See* gov't exh. K. Whether the handbook was intended to be incorporated into the regulatory agreement or is to be read in pari materia is unclear, however.[8] *See* def. mem. at 31. It therefore can not be said with certainty that either party is entitled to summary judgment based on the regulatory agreement.[9]

---

7. "Authorized repayments of advances made for necessary and reasonable operating expenses are not considered distributions and, hence, are not subject to the surplus cash rules set forth in the project Regulatory Agreement...." Def. exh. 5 at ¶ 8.A.

8. Even if paragraph 8 of the handbook is not incorporated into the regulatory agreement, paragraphs 6(e)(2) and 13(g) of the regulatory agreement prohibit the repayment to owners of

expenses that are not "reasonable expenses incident to the operation and maintenance of the project." While $1,034,961 of the owners' advances were for project payroll, it is unclear what other sums were "reasonable expenses" under paragraphs 6(e)(2) and 13(g).

9. Defendants also assert the principles of waiver and estoppel as bars to the government's claim under the regulatory agreement. The government contends that estoppel does not lie against

## IV.

■ The complaint also sets forth violations of the federal priority statute. 31 U.S.C. § 3713 (1982). Complaint ¶¶ 44–49. Under this law, the United States is accorded a priority of payment for its monetary claims in certain non-bankruptcy circumstances:

(a)(1) A claim of the United States Government shall be paid first when—

(a) a person indebted to the Government is insolvent and—

(i) the debtor without enough property to pay all debts makes a voluntary assignment of property;

(ii) property of the debtor, if absent, is attached; or

(iii) an act of bankruptcy is committed; or

.    .    .    .    .

(b) A representative of a person or an estate ... paying any part of a debt of the person or estate before paying a claim of the Government is liable to the extent of the payment for unpaid claims of the Government.

31 U.S.C. § 3713 (1982) (previously codified at 31 U.S.C. §§ 191–92 (1976)). The federal priority statute, in effect in some form for nearly 200 years, is to be liberally construed. *See United States v. Moore*, 423 U.S. 77, 81–82, 96 S.Ct. 310, 313–14, 46 L.Ed.2d 219 (1975). It has been applied to mortgagors, shareholders and managers under government programs similar to the one in this case. *See, e.g., Lakeshore Apartments, Inc. v. United States*, 351 F.2d 349, 353 (9th Cir.1965); *United States v. Dunn Garden Apartments, Inc.*, 335 F.Supp. 439, 442 (N.D.N.Y.1971); *United States v. Sullivan*, 214 F.Supp. 701, 703 (W.D.Pa.1963). *Cf. United States v. Pine Hill Apartments, Inc.*, 261 F.2d 667, 669–71 (5th Cir.1958) (if mortgagor corporation insolvent, government has priority before

repayment of corporate loans from stockholders).

■ A priority statute violation consists of three elements: (1) a debt due the United States; (2) the debtor's insolvency; and (3) the occurrence of a triggering event— an assignment of property for benefit of creditors, attachment of debtor's property, or act of bankruptcy.

■ Moreover, the statute imposes personal liability on any representative of the debtor who causes payment of a debt before the United States is paid. 31 U.S.C. § 3713(b) (1982). *See United States v. Golden Acres*, 684 F.Supp. 96, 102 (D.Del. 1988) ("[T]he purpose of § 3713(b) 'is to make those into whose hands control and possession of the debtor's assets are placed, responsible for seeing that the Government's priority is paid' "). For personal liability to attach, two further elements must be established: (1) a debtor's representative transferred or distributed the debtor's assets to pay any part of an antecedent debt; and (2) the representative knew or had notice of the obligation due the United States. *See King v. United States*, 379 U.S. 329, 339, 85 S.Ct. 427, 432–33, 13 L.Ed.2d 315 (1964).

■ As to the first requirement—that a debt must be due the United States—defendants contend that EHA "did not owe any debt to the Government until HUD acquired title to the Note and Mortgage by assignment from GNMA on January 16, 1987." Def. mem. at 53. While HUD did not have title to the note until January, 1987, GNMA received the HUD-insured mortgage note on January 9, 1985. *See* def. answer at ¶ 12.

In 1968, GNMA was created by Act of Congress upon the partition of the Federal National Mortgage Association. *See* 12 U.S.C. § 1716b. GNMA is a "body corporate without capital stock [and is] in the

---

the United States except in extraordinary situations where the defendant can show that the government engaged in affirmative misconduct. *See Office of Personnel Management v. Richmond,* — U.S. —, 110 S.Ct. 2465, 2470, 110 L.Ed.2d 387 (1990); *United States v. Asmar,* 827 F.2d 907, 912 (3d Cir.1987). While the defen-

dants point to statements and actions made by the HUD loan officers to support their claim of estoppel, this question will not be reached at this time. Given the other disputed issues of material fact, the government can reassert its estoppel position at trial.

Department of Housing and Urban Development." 12 U.S.C. § 1717(a)(2)(A). GNMA has the power "in its corporate name, to sue and be sued, and to complain and defend, in any court of competent jurisdiction...." 12 U.S.C. § 1723a(a).

Congress viewed GNMA—

as a special purpose corporation to operate with broad and flexible powers in the mainstream of the competitive and free enterprise world of mortgage lending, without the cloak of federal sovereign immunity, and by expressly authorizing GNMA to sue in its corporate name (12 U.S.C. § 1723a(a)) to enforce and defend its contract rights, Congress did not intend for GNMA to sue in the name of the United States whenever it finds the use of that august and supreme title beneficial.

*In re Adana Mortgage Bankers, Inc.,* 12 B.R. 973, 976 (Bankr.N.D.Ga.1981).

GNMA is not entitled to priority under 31 U.S.C. § 3713. The federal priority statute "may not be invoked by an agency which is not an integral part of the governmental mechanism. *See Sloan Shipyards Corp. v. United States Shipping Emergency Fleet Corporation,* 258 U.S. 549, 570, 42 S.Ct. 386, 389, 66 L.Ed. 762 (1922). *See also SBA v. McClellan,* 364 U.S. 446, 449, 81 S.Ct. 191, 194, 5 L.Ed.2d 200 (1960); *USDA v. Remund,* 330 U.S. 539, 542, 67 S.Ct. 891, 892, 91 L.Ed. 1082 (1947)." *Lapadula & Villani, Inc. v. United States,* 563 F.Supp. 782, 784 (S.D.N.Y.1983) (FDIC not an integral part of governmental mechanism).[10] Considering this legislative construct, the existence of a debt owed the United States did not occur until January 16, 1987 when GNMA assigned EHA's defaulted note and mortgage to HUD. *See* stip. ¶ 15. At this point, the statutory requirement was satisfied.

As to the second element, the debtor's insolvency, the government asserts that at the time of the repayments EHA was in default on its mortgage obligations and that its liabilities exceeded its assets. *See* gov't mem. at 30.

It is evident that "[u]nder the Federal Priority Statute, a debtor is insolvent when its liabilities exceed its assets." *Golden Acres,* 684 F.Supp. at 101. *See Lakeshore Apartments,* 351 F.2d at 353 (setting forth the test for insolvency under the statute). Here, EHA was insolvent when it repaid defendant Blumenfeld. In each year, 1985–1987, EHA's balance sheets showed liabilities in excess of assets. *See* gov't exh. O, P and Q.

The repayments, as an act of bankruptcy, fulfill the third requirement. *See Lakeshore Apartments,* 351 F.2d at 353 (" [P]ayment at a time when the debtor was insolvent necessarily favored those payees at the expense of other creditors"); *Golden Acres,* 684 F.Supp. at 101 ("A preferential transfer is a transfer of any of the property of the debtor to or for the benefit of a creditor for or on account of an antecedent debt made or suffered by such debtor while insolvent").

The government has also met the two additional requirements for personal liability. Defendants were representatives of EHA.[11] As of January 16, 1987, defendants obviously knew the mortgage was due the United States. Given these indisputable facts, defendants are personally liable for any repayments to defendant Blumenfeld after that date. The amount does not appear in the record but can be readily calculated.

## ORDER

AND NOW, this 25th day of April 1991, the parties' motions for summary judgment are ruled on as follows:

---

**10.** Congress could have expressly given GNMA any priority to which the United States is entitled. *See, e.g.,* 12 U.S.C. § 1456(a) (Federal Home Loan Bank Board "shall be entitled to all immunities and priorities including [those to] which it would be entitled if it were the United States or if it were an unincorporated agency of the United States").

**11.** A wide variety of agents or representatives of a debtor have been found personally liable under 31 U.S.C. § 3713(b). *See, e.g., Golden Acres,* 684 F.Supp. at 102 (officers and directors); *Lakeshore Apartments,* 351 F.2d at 353 (shareholder-managers); *United States v. Spitzer,* 261 F.Supp. 754, 755–56 (S.D.N.Y.1966) (officer and director).

1.  Defendants' motion based on res judicata and on the regulatory agreement is denied.

2.  The government's motion based on the regulatory agreement is denied.

3.  The government's motion based on the federal priority statute, 31 U.S.C. § 3713 (1982), is granted to the extent of payments made by Executive House Associates after January 16, 1987 in repayment of the debt owed defendant Blumenfeld.